Good morning, Your Honours. May I please the Court? Daniela Razavi appearing on behalf of Petitioner Jacinto Pascal Fernandes. This is also a Butabasi case. My client had his first hearing on the merits on October 21st, 2002. At that time, the IJ denied his application for asylum, the solding of removal and relief under the Convention Against Torture on the basis of a negative credibility finding. We appealed the case to the Board, and the Board sustained the appeal and remanded the case back to the Immigration Court judge because the Immigration Court judge had failed to make a full, outright, adverse credibility determination. The BIA ruled that my client was a credible witness, and his testimony should be given for evidential witness. I'm not sure the BIA did that. I think the BIA said we need an explicit statement by the IJ of an adverse credibility finding. That's correct. The IJ has not made that. Therefore, we remanded the IJ to see if the IJ is willing to do that. That's far from the BIA saying we find the person credible. Actually, in the 2004 decision of the BIA, the BIA did rule that he was a credible witness and that he had met his burden of establishing that he had suffered past persecution. The case was remanded back to the IJ to allow the government the opportunity to introduce a country condition report to rebut the presumption of future persecution. I take it back. I'm sorry. You're describing it correctly. I'm mixing it up with another case. Yes. So while the case was remanded back to the Immigration Court, the government filed the motion to reopen on the basis of Butabasi having been convicted of asylum fraud. During the second hearing in November 2005, there was only testimony presented by Mr. Basi with regards to how Petitioner's application had been prepared. And then Petitioner Jacinto Fernandez testified and explained how the application was prepared. There was absolutely no testimony taken going to the merit of the asylum claim. The 2005 testimony only addressed the manner in which the application had been prepared. At the end of the hearing, the IJ ruled that Petitioner had filed a frivolous asylum application based on her assessment that Petitioner's testimony had not been credible. She entered an adverse credibility determination against him. And on that basis, found he was not credible and had filed a frivolous asylum application. Our argument is that the IJ arbitrarily decided what testimony to believe in this case. The government had the burden of proving beyond the preponderance of the evidence that the application indeed was a frivolous application. The only testimony they presented was Uta Basi's testimony, a convicted felon. Now, let me ask you this that's a little bit off to one side from this. Mr. Basi testifies that you had about five or six referrals from his office, of which this was one. Is that right? Not five or six. Basically, what happened, I had a client coming to my office whose application had been prepared by him. But that was not something which became apparent until later on. I had probably actually three or four cases, I believe. And he testifies that you paid him $150 for each one. That is not true. There is nothing with regards to paying any referrals fee. He did at one point approach me. That's what he says, but it's a lie. Yeah, that is not true. I mean, there's absolutely nothing about this which is correct. There was no referral fee paid from my office to his office. Okay. There was no connection. I never went to his office. I never saw his client. He never came to my office. Did anyone from your office pay him? No. I'm by myself. There's nobody else. Okay. Nobody else. So neither you nor anyone that was an agent from you paid him. No. Okay. I would like to go back to the IJ's decision what testimony to believe. In her decision, she basically claims that she has observed the witness, Mr. Bassi, and the Petitioner as they have testified today in court at the 2005 hearing, and she has compared their testimony with each other and evidence in the record. The Court concludes that Mr. Bassi has testified credibly today and will give his testimony full weight as evident.  Okay. This refers back to the 2002 hearing where she had certain issues she had stressed in her decision originally denying his case, which ultimately was overruled by the BIA. I ‑‑ she basically when she finds him credible, she says that he has testified consistently with the information contained in the plea agreement  He has nothing to lose. And she's saying he's a straightforward witness and petitioner misrepresented his place of residence. With regards to testifying consistently with the information in the plea agreement and the judgment, there's really nothing just because he knows what was in his plea agreement and his judgment doesn't indicate that he would testify credibly with regards to how an application was prepared. At the point he testified, he had nothing to lose. He had nothing to lose, but he admitted on cross‑examination that he agreed to be a government witness because he had something to gain. He stated on cross‑examination that I agreed to testify, I wanted to get out of jail and reduce my sentence. He has not had knowledge that the cooperation with the government would lead to a lighter sentence. Yeah. We're very familiar with this phenomenon in other cases. I don't usually see it in an immigration case, but in criminal cases, you see it all the time. Sure. That the witnesses have certain ‑‑ and they've got a sentence hanging over their head, and that's a reason to be skeptical of their testimony. There's no question about that. Yeah, and that's basically what I would argue. The I.J. did not consider that at all. She basically only stated ‑‑ Well, I'm sure the I.J. considered it, but the I.J. didn't, in the end, decided to believe Mr. Bossey despite that. I mean, it's right there in front of the I.J. She basically stated he has nothing to lose, but Mr. Fernandez has everything to lose, so for that reason, he's more motivated to lie than Mr. Bossey. Well, you know, this one's not a comment at your client. I have to say one of the reasons these immigration cases are so difficult for everybody is that the people seeking asylum always have a motivation to lie. Some of them are absolute truth tellers and some of them aren't, and it's a tough job for the I.J. to figure out how to sort them out. But in this case, we basically have a he said, she said. I mean ‑‑ You're asking us to decide that the I.J. believed the wrong witness. No. I'm basically asking that the I.J. didn't use the standard she was supposed to use to decide whether he, my client, was credible testifying with regards to the manner how his case was prepared or not. She didn't use the substantial evidence standard. There is no substantial evidence in the record which would show that my client necessarily was lying or was not credible. But, counsel, with respect, at the time Mr. Bossey testified, had he not already signed his plea agreement? Yes, he had. So he knew what the deal was there. He didn't have nothing to gain on that, right? He had already received the windfall because his sentence was very light. I understand that. But the reality, it was a done deal. It was passed. It was a done deal. Okay. So when he testified and the I.J. heard what Mr. Bossey said or what your client said and weighed that, isn't the I.J. entitled to credit what Mr. Bossey said over what your client said, particularly when there was previous inconsistency? Isn't that substantial evidence, in other words? There weren't substantial inconsistencies before. All the inconsistencies were minor, didn't go to the heart of the asylum claim, and the BIA acquit was that. My client, when he went into court in 2005, basically maintained that his application was true and correct. But that's only if you believe your client. If you believe Mr. Bossey, most of your client's story that got him the treatment he got in the first place was based upon a false story. I realize your client says, no, that part was true. But if the I.J. believed Mr. Bossey, then, of course, there's a huge inconsistency, and it is substantial, right? If we chose to believe. If Mr. Bossey's belief. But I know that in other cases the government introduced statements which were similar to the petition – I mean, to the applicant's statement in other cases. This case was not like this. His declaration and his case was something very different from many other cases. He basically said that this was his only Christian client, so the case was very different. He didn't remember when he met with Petitioner, where he met, how it was prepared in the sense of did he write the declaration, send it to him. I thought it was just the opposite. I thought that because he was Christian and because he was different, he did remember it. He only remembered that he had met him. But he didn't remember when he met him for the first time. That came out on cross-examination. There was very – I mean, there was a lot of details missing with regards to when he met Mr. Fernandez for the first time, where he met, when he met him the second time, if the application was prepared and faxed or mailed to him. All these details he did not remember. He only could identify him as one of his clients, but that's how far it went in his testimony. Okay. Your time has expired. Yes. Let's hear from the government, but we'll give you a minute to respond. Thank you. Good morning, Your Honors. Your Honors, and may it please the Court. My name is Catherine Clarke, appearing on behalf of the Attorney General. Now, I notice that we've now had three lawyers from the government, all of whom have flown out from Washington, D.C., to argue a series of cases that's overlapping. I think one's going to repeat, so we only get three lawyers. I'm glad to see that the Justice Department is helping out the President's stimulus program. Thank – good morning, Your Honor. Thank you. The question is, how many jobs were created or saved by your coming out here? I have no exact statistics on that matter. To summarize this case, Petitioner is saying that he worked with Mr. Bossie to lie about matters X, Y, and Z, and multiple other matters, but that he is telling the truth about matters A and B, perhaps because he thinks those matters are what will get him asylum, even though he submitted false testimony, false declarations under oath – or false declarations in his asylum interview under oath with respect to X, Y, and Z. And he also says that he is the only client of Mr. Bossie's who ever told the truth. And Petitioner claims that because his claim is based on his Christianity and Mr. Bossie doesn't – doesn't tell the truth, right? Perhaps that would be another claim Petitioner might make. But – but Mr. Bossie testifies that all of the clients he prepared claims for, all those claims were false. And the evidence simply does not compel the conclusion that this claim was the only – was the only true claim of all of the – of all of the applications that Mr. Bossie prepared. But even liars sometimes tell the truth. Perhaps. But the evidence in this case does not compel the conclusion that this individual was telling the truth and that Mr. Bossie needed – that – and that Petitioner should have been believed over Mr. Bossie and over his own conceited lies. In an immigration context where Mr. Bossie says one thing and Mr. Fernandez says another, the IJ is aware of the plea that Mr. Bossie has entered. He testifies one way, Mr. Fernandez says something else. Since Mr. – even Mr. Fernandez agrees that Mr. Bossie was involved or his people were involved in preparing these things, isn't Mr. Bossie's testimony in and of itself substantial evidence under the – under our case law that could be used to justify a decision in this – in this case? Absolutely. And not only – not only did Mr. Bossie testify to that effect, Petitioner also lied about where he went to church. He made up an elaborate story about biking to church in Elk Grove, California. He lied about living in Elk Grove, California, so he could – and he admitted that that lie was – that he perpetuated that lie even after he made it initially to file the asylum application, specifically because he did not want his application to be denied. And that lie was, of course, perpetuated under oath, both in the – both in the proceedings before the asylum officer and then again in immigration court when Mr. Bossie was no longer involved with his case. Mr. – he perpetuated all of these lies, not just when Mr. Bossie was – or Mr. Mali were involved with his claim, but also during testimony and afterwards. And to that extent, these were his own lies, made independently, made knowingly, willingly, deliberately, and not simply dependent on Mr. Bossie being involved. He also claimed that he did not speak English, but he then admitted that he was fluent in English, even though he had previously blamed his difficulty in describing his Christianity to the asylum officer on interpretation difficulties with Mr. Mali. He never corrected the record on any of these points. He did not correct the record until Mr. Bossie was caught with respect to his claim that the – that Christians had been burned alive in India. These are all matters that go directly to the heart of his claim. The adverse credibility finding could thus be sustained based on the conflict between petitioner's testimony and Mr. Bossie's testimony or based on the inconsistencies within petitioner's testimony itself. We have both in this case. And additionally, the fraud overall in this case supports the frivolousness finding that the immigration judge entered as well. And that is – that finding was that petitioner's entire claim was false. If the entire claim is false, material elements are false. Petitioner knowingly and deliberately worked with Mr. Bossie. That satisfies the knowledge and deliberation element and the notice element dissatisfied by the documents he signed at the asylum. Let me ask you the same question I've asked your co-counsel. I suspect you don't know the answer any more than they do. Do you know how the government got onto this fraud? What tipped them off and so on? I do not, and it's not in the record. I know that part. Okay. And the motion to reopen in this case, the government – the immigration judge's decision was rendered over two months before the date when the investigation into Mr. Bossie's – into Mr. Bossie's crimes was begun. And for that reason, the information was previously unavailable. And also, with respect to both cases, the regulation at 8 CFR 1003.23B1 would cover motions to reopen based on fraud. That sets aside specific – that sets motions to reopen based on fraud in the original proceedings, apart from the time and numerical limitations, at any rate, and certainly suggests that fraud is a sort of exceptional category. Well, and in any event, the BIA can reopen anything to a sponte, and it's an unrevealable decision. That's absolutely correct. One way or the other, this one's going to get reopened. That is absolutely correct. And while the board found also in its 2004 decision that Petitioner was credible under Ninth Circuit standards because of the lack of a specific finding, it did instruct the immigration judge to presume him credible under those standards and to presume past persecution. But the motion to reopen that the government submitted satisfied 1003.23B1 and also a matter of MD, which specifically holds that even when remand is limited in a particular matter, if the government's – if either party submits a motion to reopen, the immigration judge can consider new evidence if the motion to reopen standards are satisfied, notwithstanding the limitation on the remand order. So those two cases cover the additional evidence that was introduced here. Unless the Court has any other questions, I'll submit on those arguments. Thank you. Thank you. Would you like a minute? Just one minute. I would just like to address the point with regards to the inconsistencies going to his residence. At the 2005 hearing, Mr. Fernandez did admit that he had given a false address because he wanted Mr. Bassi to file his claim. And what address were you using to communicate with him? I'm sorry? What address were you using to communicate with him? Actually, he was the one calling me, and I had made a motion before, for this case, because I don't really know where my client is right now. I lost contact. He would usually call me. I had a 916 number, which I would think is sacramental. But you never sent him any pleadings? Yes, I did. No, I didn't send him any mail. I mean, it's common for lawyers to send pieces of paper to their clients. What address did you use? No, I had sent something to Dupree Court in Elk Grove. I'm sorry? Elk Grove address. So you sent it to that address. I did send mail to an Elk Grove address, which was the address, I think, which was in the record. And then I believe at one point during the immigration court proceedings, he did file a change of address to a New Jersey address. Okay. And I think it was a P.O. box where the mail went to after that. Okay. But I was just saying, these were not misrepresentations which went to the heart of the asylum claim. He did admit that he had given a false address because he wanted his claim to be prepared by Mr. Bassi. And then at a later time, he didn't reveal it to the attorneys or to the court until later on. And with regards to his claiming he went to church in Elk Grove, I believe the judge addressed it with regards to his faith in Christianity. I mean, there was independent evidence in the records which established that he was a Christian. There was a baptism certificate and there was a marriage certificate from a church. So these didn't really go to the basis of his asylum claim. Okay. And he still claimed he's the one client who made – I mean, he's saying his claim is true. He doesn't know if he's the only client of all the applications Mr. Bassi prepared is true. But from his own knowledge of his own claim, he's maintaining that everything he filed in his declaration is correct and true. Okay. Thank you. Thank you for coming today. Thank both sides for their argument. The case of Fernandez v. Holder is now submitted for decision.
judges: Todd, Fletcher W. , Smith M.